692 F.2d 1321
 Bob DANIELS, As Administrator of the Estate of Isaac Gaston
Daniels, deceased, Plaintiff-Appellant, Cross-Appellee,
v.
TWIN OAKS NURSING HOME, a Corporation, and Mediplex
Incorporated, a Corporation, Defendants-Appellees,
Cross-Appellants.
 No. 81-7652.
 United States Court of Appeals,
Eleventh Circuit.
 Dec. 6, 1982.
Rehearing and Rehearing En Banc
Denied Jan. 26, 1983.
 
 Powell & Powell, Andalusia, Ala., A.B. Powell, III, Champ Lyons, Jr., Coale, Helmsing, Lyons & Sims, Mobile, Ala., for plaintiff-appellant, cross-appellee.
 Davis Carr, Mobile, Ala., for Mediplex, Inc.
 Appeals from the United States District Court for the Southern District of Alabama.
 Before GODBOLD, Chief Judge, and ANDERSON, Circuit Judge, and HOFFMAN*, District Judge.
 GODBOLD, Chief Judge:
 
 
 1
 Plaintiff brought suit under 42 U.S.C. Sec. 1983 and asserted a pendent state law negligence claim as administrator of the estate of his father, Isaac Daniels, for Daniels' wrongful death. Daniels disappeared while under the care of the defendant nursing home and has not been seen since. In a trial conducted before a magistrate with the consent of the parties pursuant to 28 U.S.C. Sec. 636(c) the jury returned a verdict of $1 million, but the magistrate entered a judgment n.o.v. and granted a new trial in the alternative that the judgment is reversed. We affirm the judgment n.o.v.
 
 I. The facts
 
 2
 Isaac Daniels was committed to an Alabama state mental hospital in 1970 at the age of 69 because he was senile and could not be stopped from wandering into strangers' houses. As his only mental problem was senility, Daniels was transferred in 1973 to the Twin Oaks Nursing Home, a private institution in Mobile, Alabama. After a trial period of two years Daniels was formally turned over to the nursing home on a permanent basis, under contract with the state.
 
 
 3
 Nurses' notes document that Daniels had a persistent tendency to wander off from the nursing home. During a six-month period in 1974, for example, Daniels succeeded in leaving the home five separate times. He usually was found in the neighborhood, but on one occasion in 1974 he walked into woods that were adjacent to the home and was found on the other side of a swamp located in the midst of the woods. Facts concerning the size and nature of the woods and swamp were not fully developed. All we know is that the woods were dense and that the swampy area was described as the size of a city block and as 200 yards long and the width of the courtroom. We do not know the nature of the swamp or the size of the wooded area. Other instances of leaving the home, both attempted and successful, continued to occur through 1978.
 
 
 4
 Because of Daniels' peripatetic tendency the nursing home began to restrain him regularly when he could not be watched. The means of restraint were tranquilizers and a "Posey vest," a cloth vest with straps that tie the patient to a bed or chair. On the morning of June 6, 1979, when Daniels was last seen, he was restrained in a Posey vest and was checked at hourly intervals up until 11:00. At approximately 11:45 a.m., however, it was discovered that Daniels was missing. Employees of the nursing home searched the surrounding neighborhood and the woods adjacent to the home but to no avail. Radio and television stations were notified. The next evening a team of four policemen with search dogs were called in, and they searched the woods and swamp for two to three hours. Neither Daniels nor his body was then found or has ever been found. One year later a state probate court appointed plaintiff to administer Daniels' estate, an act that plaintiff contends, and defendant does not challenge, conclusively establishes Daniels' death.
 
 
 5
 Plaintiff brought suit in federal court under 42 U.S.C. Sec. 1983 charging that the nursing home's negligence caused Daniels' death in violation of due process and that the nursing home was a state actor.[1] Plaintiff also brought a pendent state law negligence claim. The case was tried by a U.S. magistrate with the consent of the parties pursuant to 28 U.S.C. Sec. 636(c). The parties agreed that the state and federal theories of action were identical, and so the case was submitted to the jury under a single negligence instruction. The magistrate denied defendant's motion for directed verdict, and the jury found for the plaintiff and awarded $1 million in damages. The magistrate entered a judgment n.o.v., reasoning as to the state law negligence action that Alabama's rule of evidence against drawing an inference from an inference made the evidence insufficient to submit the case to the jury, and as to the federal claim that there was not the requisite abuse of power necessary to state a constitutional cause of action. In the alternative the magistrate ordered a new trial on the ground of excessive damages.
 
 
 6
 On appeal plaintiff objects to the three post-verdict rulings just summarized. Defendant contends that the judgment can be sustained on the ground that there was insufficient evidence under the federal standard to support the verdict. We affirm on the basis of the latter ground.
 
 II. Sufficiency of the evidence
 
 7
 Plaintiff's case rested entirely upon circumstantial evidence. There is no direct evidence of negligence or of the cause of death. Plaintiff contends that the jury could be properly allowed to infer negligence from the fact that Daniels could have left the nursing home only by passing a nurses' station, and that the jury could infer that this negligence proximately caused Daniels' death because he was infirm and senile.
 
 A. Federal or state standard
 
 8
 The magistrate ruled that Alabama's rule against pyramiding inferences, i.e., that one inference cannot be based upon another, see e.g., Malone Freight Lines, Inc. v. McCardle, 277 Ala. 100, 107, 167 So.2d 274 (1964), was controlling on the federal court under Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and therefore a judgment must be entered for defendant on the state law cause of action.
 
 
 9
 The magistrate erred in this ruling because Alabama's rule against pyramiding inferences is no more than a rule concerning the sufficiency of the evidence and therefore is a matter of federal law. Boeing Co. v. Shipman, 411 F.2d 365, 368-70 (5th Cir.1969) (en banc), settled that under Erie federal law controls questions of the sufficiency of the evidence in state law claims.[2] According to federal law there is no prohibition against pyramiding inferences; instead all inferences are permissible so long as they are reasonable. Fenner v. General Motors Corp., 657 F.2d 647, 650-51 (5th Cir.1981), cert. denied, 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982); Cora Pub, Inc. v. Continental Casualty Co., 619 F.2d 482, 486 (5th Cir.1980).
 
 
 10
 Defendant contends that Alabama's rule against drawing one inference from another inference is analogous to the doctrine of res ipsa loquitur in that it determines when a case can be proved by circumstantial evidence, and that because res ipsa is a matter of state law, Kicklighter v. Nails by Jannee, Inc., 616 F.2d 734, 738-40 (5th Cir.1980), so should be the rule against pyramiding inferences. State doctrines of res ipsa loquitur are respected in federal court because the doctrine has assumed the status of a substantive rule of law, affecting plaintiff's burden of proof or production of evidence, The Doctrine of Res Ipsa Loquitur in Alabama, 26 Ala.L.Rev. 433, 444-58 (1974). There is no authority or rationale to support the contention that the rule against pyramiding inferences has assumed this same substantive law status or that it is any more than a rule concerning sufficiency of the evidence. Even if there were some doubt, the issue is settled by Equitable Life Assurance Society v. Fry, 386 F.2d 239 (5th Cir.1967). There the appellants contended that a jury verdict could not be upheld because, inter alia, it necessarily involved "pyramiding of inferences." Id. at 241. The court held that "the test to be applied in diversity cases to determine the sufficiency of the evidence for submission of a case to a jury is a matter of federal law," id. at 245, and held that the inferences drawn by the jury were reasonable under federal standards, id. at 245-48.
 
 
 11
 B. The federal standard of allowable inferences
 
 
 12
 Defendant contends that the judgment can be sustained even if a federal standard is applied, because the inferences necessarily drawn by the jury were not reasonable or allowable ones. Defendant cites cases such as Smith v. General Motors Corp., 227 F.2d 210 (5th Cir.1955), and McNamara v. American Motors Corp., 247 F.2d 445 (5th Cir.1957), for the proposition that if the inference "is only a guess or a possibility, or is no more probable than one of several others," then a verdict must be directed for defendant. Smith, supra, 227 F.2d at 213.[3] There are two distinct thoughts in this statement. The first is that an inference is not reasonable if it is "only a guess or a possibility," for such an inference is not based on the evidence but is pure conjecture and speculation. This proposition is undoubtedly sound. See, e.g., Green v. Reynolds Metals Co., 328 F.2d 372 (5th Cir.1964). The second proposition is that, even though an inference supporting the verdict is a reasonable one, it cannot stand if there are other equally probable inferences; that is, where a case is proved by circumstantial evidence the court must find that the preponderance of evidence supports the plaintiff, and if there are two or more equally probable inferences only one of which supports the plaintiff a verdict must be directed for the defendant. This rule of equally probable inferences is no longer sound.
 
 
 13
 In Planters Manufacturing Co. v. Protection Mutual Insurance Co., 380 F.2d 869 (5th Cir.), cert. denied, 389 U.S. 930, 88 S.Ct. 293, 19 L.Ed.2d 282 (1967), the rule of equally probable inferences was rejected. The court explained that the rule was based on the Supreme Court's precedent in Pennsylvania R.R. v. Chamberlin, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819 (1932), which had been superseded by Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916 (1946).[4] Id. 380 F.2d at 872-74. The court held that
 
 
 14
 it is immaterial that evidence may equally support an inconsistent inference, if in fact fairminded men might draw from the evidence the inference sought by the [opponent to a directed verdict].... The question, then, is whether [the] evidence ... constitutes a basis from which the jury might with reason have inferred [for the plaintiff], and it is no answer to that question to say that a conflicting inference might with equal probability have been drawn therefrom.
 
 
 15
 Id. at 878. Accord, Continental Ore Co. v. Union Carbide Corp., 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962) (we are bound "to give the [plaintiff] the benefit of all inferences which the evidence fairly supports even though contrary inferences might reasonably be drawn"). See generally, 9 Wright & Miller, Federal Practice and Procedure, Sec. 2528 at 563-68 (1971).[5]
 
 
 16
 Smith v. General Motors, supra, and similar cases were decided at a time when state law controlled the sufficiency of the evidence in diversity cases. Under the modern case law applying a federal standard, a verdict based on circumstantial evidence is not infirm simply because the evidence supports an equally probable inference to the contrary. It is the jury that chooses among allowable inferences. The standard for determining whether an inference is allowable is generally whether it is a reasonable one, that is, whether it is one that "reasonable and fair-minded men in the exercise of impartial judgment" might draw from the evidence. Boeing Company v. Shipman, supra, 411 F.2d at 375. An inference is not unreasonable simply because it is based in part on conjecture, for an inference by definition is at least partially conjectural. Helene Curtis Industries, Inc. v. Pruitt, 385 F.2d 841, 851 (5th Cir.1967), cert. denied, 391 U.S. 913, 88 S.Ct. 1806, 20 L.Ed.2d 652 (1968). Yet a jury will not be allowed to engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility. Id. Such an inference is infirm because it is not based on the evidence. Unavoidably, "[i]n deciding how much the jury can speculate ... [t]he line of demarcation which we are required to walk is ephemeral." Id.
 
 C. The inferences in this case
 
 17
 Applying these principles to the facts of this case, we hold that the verdict cannot stand because a finding that negligence of the nursing home proximately caused Daniels' death is a product of too great a degree of speculation and conjecture based on the evidence in this record.
 
 
 18
 First, with respect to negligence, there was sufficient evidence from which a jury could infer that Daniels exited the home through negligence of the defendant. An exit door was kept unlocked, and a nurses' station that had to be passed in order to exit was required to be attended. No trace of Daniels was found in the home. Thus, the evidence supports inferences that he exited through this door and did so because of the home's negligence in either failing to keep the station attended or failing to monitor the exit properly.
 
 
 19
 As to the fact of death, the evidence permitted the jury to find that Daniels is no longer living.[6] Here the direct evidence ends. It is unknown whether Daniels exited alone or accompanied by or taken by someone else. We assume, however, that based upon the prior history of escapes and wandering the jury could infer that Daniels exited on his own and wandered away from the home. There is no direct evidence of where he went or of the cause of death; these facts must be inferentially determined. Plaintiff concedes that the bare fact of disappearance, plus presumed death, is insufficient to support an inference of proximate cause of death. But plaintiff points to circumstantial evidence that he contends is sufficient to support two theories of death either of which might have been accepted by the jury and both of which are within the foreseeable risks of wandering from the home.
 
 
 20
 First, plaintiff observes that Daniels was taking heart medication as near as six weeks prior to his disappearance and suggests that a jury could infer that Daniels died as the result of failure to take his medication. But there is no evidence in the record concerning the purpose of the medication indicating that it was vital or life-sustaining. The jury was not even told what Daniels' heart ailment was beyond a statement that the medicine he was taking was usually given for "some coronary insufficiency or an angina-like syndrome."[7] A reasonable and fair-minded juror could not draw from this evidence a conclusion that Daniels died from his heart condition as a consequence of not receiving medication for that condition.
 
 
 21
 Plaintiff's second theory is that the jury could infer that Daniels wandered into the woods adjacent to the nursing home and perished from exposure or accident. In the midst of the woods is the swamp. Possibly the jury might infer that Daniels in his infirm and senile condition died from exposure or accident in the woods if there were sufficient evidence that he went into the woods, but the evidence is insufficient to support this preliminary finding. The evidence that Daniels might have wandered into the woods consists of this: during a prior escape he had entered the woods; the woods are adjacent to the home; and his body was never discovered elsewhere. We examine this circumstantial evidence to determine whether it is strong enough to support a rational inference that Daniels wandered into the woods.
 
 
 22
 Daniels' prior excursion into the woods gives insubstantial support to this inference. Of the seven or eight instances where Daniels left the home in the past, he only once went into the woods.[8] In all other instances Daniels went into the surrounding residential neighborhood; he exhibited a particular preference for a nearby cemetery. More important, however, is that the only prior incident of going into the woods was remote in time, occurring five years prior to Daniels' final disappearance. This does not establish a habit or propensity or substantial likelihood of his wandering into the woods on the date of his disappearance.
 
 
 23
 The proximity of the woods and the fact that Daniels was never discovered, while consistent with the theory that Daniels wandered into the woods, suggest only that disappearance in the woods was one possibility. Daniels might have disappeared in any one of a number of ways. To mention only a few, a passing motorist might have given him a ride out of town, he might have been the victim of violent crime, or he might have gone into an abandoned building and died from natural causes unrelated to his wandering. Because there is no evidence concerning the character of the surrounding neighborhood tending to negate these other possibilities, the mere possibility that he wandered into the woods is too speculative to be the basis for a jury verdict.
 
 
 24
 Furthermore, the bare possibility suggested by the proximity of the woods and Daniels' disappearance is "at war with uncontradicted ... facts." Fenner v. General Motors, supra, 657 F.2d at 650-51. There was no ready access into the woods. A fence surrounding three sides of the nursing home separated the home from the woods. In addition, there was uncontradicted testimony from an employee who searched the woods that after going in 10 to 15 feet the thickness of the woods made it hard to proceed without breaking limbs. As the district court acknowledged, the woods were "nearly impenetrable." In his earlier venture into the woods Daniels made it through to the far side of the swamp, but the jury did not know whether five years earlier the woods were as penetrable or impenetrable as when Daniels disappeared. The wooded area was searched with no success by a team of four policemen with trained dogs for a period of two to three hours, and the assistant administrator of the home searched it on several occasions.[9] Plaintiff asserts that there was never a thorough search of the woods, but there is no evidence indicating that these efforts were insufficient.
 
 
 25
 In conclusion, a careful analysis shows Daniels' prior excursion into the woods to be the only evidence that tends to give real substance to the possibility of disappearance in the woods. In the circumstances of this case, however, where this event occurred five years earlier as only one incident in a number of wanderings, this evidence is so slight and remote as to amount to at most a scintilla of evidence. Without any greater indication of how Daniels disappeared and of what caused his death an inference of proximate cause remains too speculative to be one supported by "substantial evidence." Boeing, supra, 411 F.2d at 374.
 
 
 26
 We do not reach our conclusion on the strength of inferences contrary to the verdict. This is not a case where the evidence supports conflicting inferences. Instead, this is a case where there is no evidence beyond a mere scintilla that tells us what happened to Daniels; it is this lack of evidence that keeps the case from the jury and requires a directed verdict against the party with the burden of proof. We do not require that the cause of death be identified with scientific precision. See Alman Brothers Farms & Feed Mill, Inc. v. Diamond Laboratories, Inc., 437 F.2d 1295, 1301 (5th Cir.1971). However, the evidence must support an explanation of the cause of death that is sufficiently articulated that the jury is not permitted to engage in an unallowable degree of speculation. Plaintiff's explanations are not supported by the evidence.
 
 
 27
 Cases cited by plaintiff do not contradict our holding. In other cases where a nursing home or similar institution was held liable for a patient who wandered away and died, the body was found and the cause of death was ascertainable; therefore the only litigated issue was the negligence of the home, not proximate cause. See Krestview Nursing Home, Inc. v. Synowiec, 317 So.2d 94 (Fla.App.1975), cert. denied, 333 So.2d 463 (1976); Milton v. State, 293 So.2d 645 (La.Ct.App.1974). See generally, Liability of Hospital or Sanitarium for Injury or Death of Patient as a Result of His Escape or Attempted Escape, 70 A.L.R.2d 347 (1960); Patient Tort Liability of Rest, Convalescent or Nursing Homes, 83 A.L.R.3d 871, at Sec. 7, "Wandering Away" (1978). Plaintiff erroneously attempts to rely on the doctrine of res ipsa loquitur. This doctrine may be used only to prove negligence, not proximate cause. Georgia Power Co. v. Edmonds, 233 Ala. 273, 275, 171 So. 256, 258 (1936); Alabama Power Co. v. Bryant, 226 Ala. 251, 254, 146 So. 602, 605 (1933).
 
 
 28
 Judge Hoffman agrees with this opinion with respect to the granting of judgment n.o.v., that is, the merits of the state law claim. He has, however, filed a special concurring opinion, expressing his view that the claim brought under 42 U.S.C. Sec. 1983 does not present a substantial federal claim and should have been dismissed. With no substantial federal claim stated, in his view, the court lacked jurisdiction to hear the state wrongful death claim.
 
 
 29
 Chief Judge Godbold is of the view that the Sec. 1983 claim was not subject to dismissal since prior decisions did not "inescapably render the claim[s] frivolous." Curtis v. Taylor, 625 F.2d 645, 649-50 (5th Cir.1980); Jackson v. Stinchcomb, 635 F.2d 462, 471 (5th Cir.1981). Judge Anderson concurs in this view but dissents on the merits of the state law claim and has filed a dissenting opinion on that issue.
 
 
 30
 The judgment is AFFIRMED.
 
 ANDERSON, Circuit Judge, dissenting:
 
 31
 I agree with all of Chief Judge Godbold's opinion for the majority, except his conclusion that there is not sufficient evidence to support the jury finding of proximate cause. I would conclude that the jury might reasonably infer that the defendant's negligence in permitting Daniels to wander off was a proximate cause of his death. Daniels was a 78 year old senile man who was on heart medication and tranquilizers at the time. The record in this case contains evidence amply justifying the inference that Daniels was unable to cope with the real world environment outside the nursing home, and that it would pose a risk to Daniels' health and safety to thrust him alone into the outside world. If the cause of Daniels' death was exposure to the elements in the nearby woods or swamp, the defendant's negligence would clearly be a contributing proximate cause, as the majority impliedly concedes. If Daniels died of a heart attack or some other natural cause and if his failure to take his medicines and/or exposure to the outside world precipitated his death, then defendant's negligence would be a contributing proximate cause. The majority concedes that the jury properly found that Daniels left the nursing home as a result of defendant's negligence, and that Daniels died. I submit that the jury could reasonably infer that defendant's negligence was a proximate cause of the death. Of course, I agree that it is conceivable that Daniels could have died from natural causes unrelated to his failure to take his medications, and unrelated to the dangers and shock he inevitably experienced in being thrust upon the outside world for the first time in nine years without food, money or shelter and without even a rudimentary intelligence which he had lost to senility; however, I respectfully dissent from the majority's conclusion that no "reasonable and fair-minded" jury could reasonably infer that the foregoing dangers created by defendant were a contributing proximate cause of Daniels' death. In this regard, I agree with the court below which held:
 
 
 32
 When a senile 78-year-old who cannot bathe or dress himself wanders out of a nursing home adjacent to nearly impenetrable woods with a swamp in the middle, and he is never seen again, it would be logical to believe that the fact of wandering caused his death. Certainly there is no evidence leading to a contrary or competing inference, so we do not simply choose one among several arguable inferences.
 
 
 33
 R. 94 (footnote omitted).
 
 HOFFMAN, District Judge, concurring specially:
 
 34
 Plaintiff, Bob Daniels, as administrator of the estate of the decedent, Isaac Daniels, asserts two claims in this non-diversity action. The first is a claim under 42 U.S.C. Sec. 1983 in which the plaintiff alleges that the defendants deprived Isaac Daniels of the right to life as guaranteed by the Constitution of the United States, while acting under color of law, by failing to properly supervise and provide safe care for him. The second claim is a pendent state law negligence claim for the wrongful death of Isaac Daniels which, under Alabama law, is limited to a recovery for punitive damages.
 
 
 35
 The case was tried by a magistrate and, upon an agreement of the parties that the federal and state theories of recovery were identical, both claims were submitted to the jury under a single negligence instruction. The jury returned a single general verdict for the plaintiff, awarding $1 million. The magistrate, however, entered a judgment n.o.v., and in the alternative, granted a new trial on the ground that damages were excessive.
 
 
 36
 Judge Godbold, in this appeal, affirms the granting of the judgment n.o.v. on the ground that there was insufficient evidence under the federal standard to support the jury's verdict. I agree with Judge Godbold's opinion as to the granting of judgment n.o.v. I concur specially, however, because in my opinion the 42 U.S.C. Sec. 1983 claim does not present a substantial federal claim and as such the section 1983 claim should have been dismissed. Since no substantial federal claim was presented, the court lacked jurisdiction to hear the state negligent wrongful death claim.
 
 
 37
 A federal court has jurisdiction to hear a pendent state claim only when the court is presented with a substantial federal question and the state and federal claims derive from a common nucleus of operative fact. United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966); Jackson v. Stinchcomb, 635 F.2d 462, 470 (5th Cir.1981). If a substantial federal claim is not presented, the court does not have pendent jurisdiction to hear a related state claim. See also Gellert v. Eastern Airlines, Inc., 688 F.2d 723 (11th Cir.1982). A claim is insubstantial if it lacks merit or if prior decisions clearly foreclose the matter. See Jackson v. Stinchcomb, supra, at 471; Florida East Coast Railway Co. v. United States, 519 F.2d 1184, 1194 n. 26 (5th Cir.1975). The question of whether pendent jurisdiction is proper normally will be resolved on the pleadings, but if jurisdiction is assumed the question should remain open throughout the litigation. United Mine Workers v. Gibbs, supra, at 727, 86 S.Ct. at 1139. Thus, if it appears from the pleadings that a substantial federal question is not presented, the court does not have jurisdiction to hear the pendent state claim, or if it appears during the trial that the federal claim is insubstantial the pendent claim must then be dismissed.
 
 
 38
 It is my opinion that the plaintiff in this case failed to present a substantial federal question and thus the court lacked jurisdiction to hear either the federal or state claim.[1]
 
 
 39
 A claim for relief under 42 U.S.C. Sec. 1983[2] must embody two essential elements. First, the conduct complained of must have deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. Second, the conduct complained of must have been committed by a person acting under color of law. Parratt v. Taylor, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981);[3] Adickes v. S.H. Kress & Co., 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970). These two elements are jurisdictional requisites for a section 1983 action, thus if the plaintiff fails as to either the court cannot hear the suit. See Polk County v. Dodson, 454 U.S. 312, 315, 102 S.Ct. 445, 448, 70 L.Ed.2d 509 (1981). The plaintiff, in the present case, has not satisfied either of the requirements for a section 1983 claim.
 
 
 40
 I. CONSTITUTIONAL DEPRIVATION?
 
 
 41
 First, the plaintiff has not complained of conduct involving a deprivation of constitution magnitude. The plaintiff alleges that the defendant nursing home deprived Isaac Daniels of life by negligently failing to properly supervise and provide safe care for him. Presumably, the plaintiff is claiming that the defendant's conduct violated the fourteenth amendment's protection against deprivation of life without due process of law. There cannot, of course, be a constitutional right to life without more.
 
 
 42
 On several occasions the Supreme Court has warned that section 1983 imposes liability for violations of rights protected by the Constitution, and not for violations of duties of care arising out of tort law. See, e.g., Baker v. McCollan, 443 U.S. at 146, 99 S.Ct. at 2695; Estelle v. Gamble, 429 U.S. 97, 104-06, 97 S.Ct. 285, 291-92, 50 L.Ed.2d 251 (1976); Paul v. Davis, 424 U.S. 693, 698-701, 96 S.Ct. 1155, 1159-1160, 47 L.Ed.2d 405 (1976). To warrant section 1983 relief, the defendant's actions must amount to a constitutional violation. See Baker v. McCollan, supra. While some conduct may clearly be violative of tort law, it may not be a constitutional injury, and the proper remedy is not a section 1983 claim but a suit in state court under traditional tort principles. Id. at 146, 99 S.Ct. at 2695. See also Shillingford v. Holmes, 634 F.2d 263 (5th Cir.1981).
 
 
 43
 Even if I were to assume that the defendant nursing home may have been negligent and as such its conduct was wrongful, the conduct was only tortious and did not constitute a constitutional deprivation. My opinion is based on previous decisions of this court and other courts. In Williams v. Kelley, 624 F.2d 695 (5th Cir.1980), cert. denied, 451 U.S. 1019, 101 S.Ct. 3009, 69 L.Ed.2d 391 (1981), the Fifth Circuit addressed whether negligent wrongful death stated a deprivation of a constitutional right cognizable in a section 1983 claim. In Williams the decedent died as a result of a choke hold placed on him by a police custodial officer while the officer was attempting to restrain him. 624 F.2d at 696. The mother of the decedent sued the officers involved under section 1983 for wrongful death. Id. at 697. The court concluded that the allegations did not state a deprivation of a federal right and thus the requirements for a section 1983 suit had not been met. Id. at 697-98.[4]
 
 
 44
 More recently in Hull v. City of Duncanville, 678 F.2d 582 (5th Cir.1982), the Fifth Circuit continued the Williams v. Kelley analysis and applied it to a section 1983 suit for injuries arising out of a train-vehicle collision. The father of the injured minor sued the city under section 1983 for depriving "the minor without due process of law of the minor's right to be free from permanently-disabling injuries." 678 F.2d at 583. The action was based upon the city's failure to enforce its train traffic speed limit, and its negligent failure to maintain the crossing and traffic signals. Id. at 583-84. The court found that the actions pleaded may constitute a tort, but did not establish a constitutional violation actionable under section 1983. Id. at 584-85.[5]
 
 
 45
 Additionally, dicta in Supreme Court cases leads me to the conclusion that this type of negligent wrongful death claim does not state a constitutional violation. In Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), Justice Rehnquist, writing for the majority, cautioned against opening up section 1983 to such litigation. He stated:
 
 
 46
 If [plaintiff's] view is to prevail, .... it would be difficult to see why the survivors of an innocent bystander mistakenly shot by a policeman or negligently killed by a sheriff driving a government vehicle, would not have claims equally cognizable under Sec. 1983.
 
 
 47
 424 U.S. at 698, 96 S.Ct. at 1159. The caution was reiterated in Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), when Justice Rehnquist stated:
 
 
 48
 To accept respondent's argument that the conduct of the state officials in this case constituted a violation of the Fourteenth Amendment would almost necessarily result in turning every alleged injury which may have been inflicted by a state official acting under "color of law" into a violation of the Fourteenth Amendment cognizable under Sec. 1983. It is hard to perceive any logical stopping place to such a line of reasoning. Presumably, under this rationale any party who is involved in nothing more than an automobile accident with a state official could allege a constitutional violation under Sec. 1983. Such reasoning "would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States." Paul v. Davis, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976). We do not think that the drafters of the Fourteenth Amendment intended the Amendment to play such a role in our society.
 
 
 49
 451 U.S. at 544, 101 S.Ct. at 1917. Similarly, Justice Powell stated in his concurrence in Parratt:
 
 
 50
 [Section 1983] was enacted to deter real abuses by state officials in the exercise of governmental powers. It would make no sense to open the federal courts to lawsuits where there has been no affirmative abuse of power, merely a negligent deed by one who happens to be acting under color of state law.
 
 
 51
 451 U.S. at 549, 101 S.Ct. at 1920.
 
 
 52
 For the above stated reasons, I believe that the conduct of the defendant nursing home, which the plaintiff bases his section 1983 claim upon, clearly does not amount to a constitutional deprivation.
 
 
 53
 II. STATE ACTION?
 
 
 54
 Second, the conduct of the defendant nursing home that the plaintiff complains of does not constitute state action.[6] The plaintiff focuses on several factors in arguing that the nursing home's conduct is state action. The plaintiff relies on the fact that the nursing home receives substantial funding from the state and that nursing homes are regulated by the state. Additionally, the plaintiff points to the contract between the defendant and the state that provided for the care of Daniels. According to the plaintiff, these factors evidence an interdependence and symbiotic relationship between the nursing home and the state. The plaintiff argues, also, that in caring for Daniels the nursing home was carrying out an inherently and exclusively government function, and thus there was state action.
 
 
 55
 The actions of a private party can be so closely associated with the state as to constitute state action. A private party will be subject to suit under section 1983 if the conduct allegedly causing the deprivation of a federal right is "fairly attributable to the state." Lugar v. Edmondson Oil Co., --- U.S. ----, 102 S.Ct. 2744, 2754, 73 L.Ed.2d 482 (1982); Rendell-Baker v. Kohn, --- U.S. ----, 102 S.Ct. 2764, 2770, 73 L.Ed.2d 418 (1982). The state must be shown to be sufficiently connected with the particular aspect of the defendant's conduct complained of so that the defendant is treated as a state actor and the defendant's act is treated as that of the state. See Lugar v. Edmondson Oil Co., 102 S.Ct. at 2754-55; Blum v. Yaretsky, --- U.S. ----, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982). See also Sims v. Jefferson Downs, 611 F.2d 609, 611 (5th Cir.1980). A number of different factors or tests have been articulated which can be looked to in determining whether conduct of a private party is fairly attributable to the state.[7]
 
 
 56
 The complaining party can demonstrate that "there is a sufficiently close nexus [or symbiotic relationship ] between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself." Jackson v. Metropolitan Edison Co., 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974) (emphasis added). See also Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); Sims v. Jefferson Downs, 611 F.2d at 611. The plaintiff may also demonstrate that the state exercised its coercive power or provided significant encouragement such that the defendant's act was coerced by the state. Adickes v. S.H. Kress & Co., 398 U.S. 144, 170, 90 S.Ct. 1598, 1615, 26 L.Ed.2d 142 (1970). Last, the plaintiff may demonstrate that the private defendant exercised some power delegated to it by the state which is "traditionally exclusively reserved to the State." Jackson v. Metropolitan Edison Co., 419 U.S. at 352-53, 95 S.Ct. at 454-55. See also, Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 157-61, 98 S.ct. 1729, 1733-36, 56 L.Ed.2d 185. Considering all of the factors in this case that may be evidence of state action, in my opinion, there is no state action.
 
 
 57
 I believe the Supreme Court decision in Blum v. Yaretsky, --- U.S. ----, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), controls this case and directs a finding of no state action.[8] In Blum v. Yaretsky, the Supreme Court considered whether a nursing home was a state actor when decisions were made regarding the transfer of Medicare patients. 102 S.Ct. at 2781-82. The challenged transfers primarily involved decisions of a utilization review committee to move Medicare patients from "skilled nursing facilities" to less expensive "health related facilities." Id. at 2781, 2786. The nursing home took care of Medicare patients and the state paid the medical expenses of more than 90% of the patients. The state also subsidized the operating and capital costs of the facility. Id. at 2789. The nursing home was licensed and regulated by the state, and subject to on-site inspections by state medical review teams. Id. at 2788 n. 21, 2789. The Supreme Court considered all the factors and concluded that there was no state action. The Court stated:
 
 
 58
 But accepting all of these assertions as true, we are nonetheless unable to agree that the State is responsible for the decisions challenged by respondents. As we have previously held, privately owned enterprises providing services that the State would not necessarily provide, even though they are extensively regulated, do not fall within the ambit of Burton. Jackson v. Metropolitan Edison Co., 419 U.S. 345, 357-358, 95 S.Ct. 449, 456-57, 42 L.Ed.2d 477. That programs undertaken by the State result in substantial funding of the activities of a private entity is no more persuasive than the fact of regulation of such an entity in demonstrating that the State is responsible for decisions made by the entity in the course of its business.
 
 
 59
 Id. at 2789 (emphasis added). The Court specifically concluded that nursing homes do not perform a function that falls within the exclusive prerogative of the state. Id. at 2789-90. The Court stated:
 
 
 60
 We are also unable to conclude that the nursing homes perform a function that has been "traditionally the exclusive prerogative of the State." Jackson v. Metropolitan Edison Co., supra, at 353, 95 S.Ct., at 454.... Even if respondents' characterization of the State's duties were correct, however, it would not follow that decisions made in the day-to-day administration of a nursing home are the kind of decisions traditionally and exclusively made by the sovereign for and on behalf of the public. Indeed, respondents make no such claim, nor could they.
 
 
 61
 Id. (emphasis added).
 
 
 62
 In Blum the Supreme Court likened the nursing home situation to the public defender situation in Polk County v. Dodson, 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981).[9] Blum v. Yaretsky, 102 S.Ct. at 2788. The Court explained:
 
 
 63
 This case, therefore, is not unlike Polk County v. Dodson, ... in which the question was whether a public defender acts "under color of" state law within the meaning of 42 U.S.C. Sec. 1983 when representing an indigent defendant in a state criminal proceeding. Although the public defender was employed by the State and appointed by the State to represent the respondent, we concluded that "[t]his assignment entailed functions and obligations in no way dependent on state authority."... The decisions made by the public defender in the course of representing his client were framed in accordance with professional canons of ethics, rather than dictated by any rule of conduct imposed by the State. The same is true of nursing home decisions to discharge or transfer particular patients because the care they are receiving is medically inappropriate.
 
 
 64
 102 S.Ct. at 2788.
 
 
 65
 Although not involving a nursing home, another case the Supreme Court decided along with Blum v. Yaretsky, directs a finding of no state action in this case. In Rendell-Baker v. Kohn, --- U.S. ----, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), the Supreme Court addressed whether a private school was a state actor when it discharged certain employees. The school was a non-profit institution in Brookline, Massachusetts, that specialized in giving high school instruction to students with drug, alcohol, or behavioral problems, or other special needs. 102 S.Ct. at 2755-67. Students were referred to the school by the Brookline or Boston school committees, or by the Drug Rehabilitation Division of the Massachusetts Department of Mental Health. The school had a contract with the Boston School Committee requiring it to carry out the individualized plans developed for each student. The school also had a contract with the State Drug Rehabilitation Division. During the years pertinent to the case, the school had approximately 50 students, most having been referred to the school, and none paying tuition. Public funds provided at least 90% of the school's operating budget and the school was regulated by the public authorities. Id. The Supreme Court followed the same analysis it applied in Blum v. Yaretsky, supra, considered all of the factors, and concluded that there was no state action. Id. at 2770-72. In referring to the contracts the Court stated, "Acts of such private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts." Id. at 2771. The Court also specifically concluded that there was no "public function" or "symbiotic relationship" involved. Id. at 2772.
 
 
 66
 In my opinion, considering the results in Blum v. Yaretsky, supra, Rendell-Baker v. Kohn, supra, Polk County v. Dodson, supra, and other cases, the facts of the present case clearly indicate that there is no state action.
 
 
 67
 For the reasons discussed above, I believe the decisions of the district court and the magistrate that there was a constitutional deprivation and that there was state action were erroneous. Since the plaintiff did not allege any deprivation amounting to a violation of a federal right, and the activities of the defendant did not involve any state action, the plaintiff did not present a substantial federal question and the district court was without jurisdiction to consider the section 1983 claim or the pendent state claim.
 
 
 68
 Nevertheless, I join in the views of Chief Judge Godbold on the merits of the pendent state action.
 
 
 
 *
 Honorable Walter E. Hoffman, U.S. District Judge for the Eastern District of Virginia, sitting by designation
 
 
 [1]
 Neither the State of Alabama nor any agency was sued but only the private nursing home. Mediplex Corp., the second named defendant, is the parent corporation of Twin Oaks Nursing Home. The jury found against only the nursing home. No issues concerning the parent corporation are raised on appeal, and therefore we refer to only the defendant nursing home
 
 
 [2]
 We are bound by this case and others of the former Fifth Circuit cited in this opinion and handed down prior to October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc)
 
 
 [3]
 The court in Smith also said that "a case can go to the jury only if 'the circumstantial evidence amounts to a preponderance of all reasonable inferences that can be drawn from the circumstances in the evidence to the end that the evidence is not reasonably susceptible of two equally reasonable inferences.' " Id. at 216
 
 
 [4]
 In Chamberlin the Court stated that in "a case ... where proven facts give equal support to each of two inconsistent inferences ... judgment, as a matter of law, must go against the party [with the burden of proof]." 288 U.S. at 339, 53 S.Ct. at 393. In Lavender the Court said that where there is "a reasonable basis in the record for inferring [for the plaintiff] ... [i]t is no answer to say that the jury's verdict involved speculation and conjecture. Whenever facts are in dispute or the evidence is such that fairminded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference." 327 U.S. at 652, 66 S.Ct. at 743. See also, Tennant v. Peoria & Pekin Union R. Co., 321 U.S. 29, 34-35, 64 S.Ct. 409, 412-413, 88 L.Ed. 520 (1944)
 
 
 [5]
 This unequivocal rejection of the equally probable inference rule survives despite the subsequent en banc decision in Boeing Co. v. Shipman, supra. In Boeing the former Fifth Circuit undertook to establish the federal standard for sufficiency of the evidence in civil cases. The court stated that the Planters court had incorrectly relied on Lavender because Lavender was an FELA case where the standard for submission to the jury was statutorily weaker than the standard in ordinary civil cases. The court therefore "reject[ed] the Planters principle." 411 F.2d at 370-73
 Boeing's rejection of the "Planters principle" did not affect the aspect of Planters that disapproved the equally probable inferences rule. This latter aspect of Planters survives. First, Boeing did not address this aspect of Planters or this aspect of the Supreme Court FELA cases on which Planters relied. The aspect of Lavender and other FELA cases that the court took issue with in Boeing was that any evidence of negligence, even the slightest, would send the case to the jury. Id. at 370-71. Nowhere in Boeing is there an indication that the equally probable inferences rule was at issue or was considered. Therefore, in Boeing the court addressed only what quantum of evidence would make an inference reasonable, not whether the jury is allowed to choose between two equally probable, yet reasonable, inferences.
 Second, the equally probable inferences rule of old cases such as Smith v. General Motors, supra, is inconsistent with the standard of sufficiency adopted in Boeing. In Boeing the court held that a verdict should be directed only if "the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict." Id. at 374 (emphasis added). This does not allow a rule where a verdict is directed simply because a contrary inference is equally likely. The contrary inference must be "so strong and overwhelming" that the inference in favor of plaintiff is unreasonable. Moreover, in Boeing the court expressly stated that "it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences." Id. at 375 (emphasis added).
 Third, the former Fifth Circuit has frequently rejected the equally probable inferences rule in cases following Boeing. See Alman Brothers Farms & Feed Mill, Inc. v. Diamond Laboratories, Inc., 437 F.2d 1295, 1301 (5th Cir.1971); Tucker v. Bethlehem Steel Corp., 445 F.2d 390, 392 (5th Cir.1971) ("Given an apparent evidentiary basis for the verdict ... the appellate court's function is exhausted, 'it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable.' "); Callon Petroleum Co. v. Big Chief Drilling Co., 548 F.2d 1174, 1180 (5th Cir.1977) ("It should be left to the ... jury ... to resolve such conflicting inferences."); Nunez v. Superior Oil Co., 572 F.2d 1119, 1124 (5th Cir.1978) (" 'the choice between permissible inferences is for the trier of facts' "); Southway Theatres v. Georgia Theatre Co., 672 F.2d 485, 495 (5th Cir.1982) (Unit B) (" 'Where more than one reasonable inference can reasonably be drawn from the proof, it is for the jury to determine the proper one.' "). But see Prudential Insurance Co. v. Schroeder, 414 F.2d 1316, 1319 (5th Cir.1969).
 
 
 [6]
 The magistrate ruled that the probate judge's opening of Daniels' estate for administration was an adjudication of the fact of death not subject to collateral attack. We do not decide the validity of this ruling, for no objection was made in the district court nor has the issue been raised on appeal
 
 
 [7]
 The evidence concerning the heart medication consisted solely of the following testimony by a psychiatrist who examined Daniels' records:
 Q: Now, do your records reflect as of ... some six or seven weeks before he disappeared whether or not Mr. Daniels was taking any medication ...?
 A: According to this note, he was taking Peritrate
 ....
 Q: What is Peritrate, please sir?
 A: Its primary purpose is a coronary vasodilator; it's to dilate the blood vessels in the heart; it's usually given for some coronary insufficiency or an angina-like syndrome.
 
 
 [8]
 Later that same day he escaped again and was seen heading in the direction of the woods
 
 
 [9]
 The assistant administrator testified that he was "pretty confident that [Daniels] had not been in there" because there was no evidence of trampled brush tending to show prior passage, whereas he could see where he had passed during his search because he left trampled brush
 
 
 [1]
 Even where the district court has pendent jurisdiction, it is discretionary with the court whether to exercise the pendent jurisdiction. United Mine Workers v. Gibbs, 383 U.S. at 726, 86 S.Ct. at 1139; Jackson v. Stinchcomb, 635 F.2d at 472. In deciding whether to exercise pendent jurisdiction there are several factors the court should weigh. See United Mine Workers v. Gibbs, 383 U.S. at 725-26, 86 S.Ct. at 1138-39. The justification for exercising pendent jurisdiction lies in weighing the considerations of (1) judicial economy; (2) convenience and fairness to the litigants; (3) avoiding needless decisions of state law as a matter of comity, and to promote justice between the parties by procuring for them a surer-footed reading of the applicable law; (4) whether the state issues predominate in terms of proof, scope of the issues, or comprehensiveness of the remedy sought; and (5) the likelihood of jury confusion in treating divergent legal theories of relief. Id. See also Jackson v. Stinchcomb, 635 F.2d at 472-73. If after considering these factors, the balance is against the court exercising pendent jurisdiction, it should not hear the pendent claim. See United Mine Workers v. Gibbs, supra. Additionally, if the federal claims are dismissed before trial, even though not insubstantial, the state claims should be dismissed as well. Id. at 726, 86 S.Ct. at 1138
 In the present case, even assuming a substantial federal claim was presented, it was an abuse of discretion for the court to exercise its pendent jurisdiction. After weighing all the factors listed above, the balance falls unquestionably on the side of refraining from exercising pendent jurisdiction.
 
 
 [2]
 42 U.S.C. Sec. 1983 provides:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 
 
 [3]
 Parratt v. Taylor involved a section 1983 claim alleging a negligent deprivation of property. The Supreme Court allowed the claim based upon the allegation of simple negligence because section 1983 does not contain a "state-of-mind" requirement. 451 U.S. at 531-35, 101 S.Ct. at 1910-12. The Court went on to point out, however, that the fourteenth amendment protects only against deprivations occurring "without due process of law." Id. at 531, 101 S.Ct. at 1910. The Court held that the plaintiff had not been deprived of property without due process because the State of Nebraska provided a tort claims procedure that satisfied the due process of law requirement of the fourteenth amendment. Id. at 535-44, 101 S.Ct. at 1912-17
 The courts that have attempted to implement the Parratt decision, have thus far been unable to reach a concensus as to the full meaning and reach of the decision. See, e.g., Pantoja v. City of Gonzales, 538 F.Supp. 335 (N.D.Cal.1982); Howse v. DeBerry Correctional Institute, 537 F.Supp. 1177 (M.D.Tenn.1982); Starstead v. City of Superior, 533 F.Supp. 1365 (W.D.Wis.1982). The present case at first blush appears to be one that may be impacted by Parratt, since it involves a simple negligence section 1983 claim, however, a thorough reading of Parratt and prior Supreme Court cases clearly reveals that this court does not need to address whether the Parratt analysis and holding applies. Before the Parratt analysis is reached and an exploration of the relationship between the defendant's state-of-mind and liability under section 1983 is necessary, the plaintiff must first establish the basic elements of a section 1983 claim. Parratt v. Taylor, 451 U.S. at 535, 101 S.Ct. at 1912; Baker v. McCollan, 443 U.S. 137, 139-40, 99 S.Ct. 2689, 2692-93, 61 L.Ed.2d 433 (1979). See also Shillingford v. Holmes, 634 F.2d 263, 265 (5th Cir.1981). If the basic elements of a section 1983 claim are not established initially, as is the case here, it is not necessary to decide whether Parratt applies because a valid claim has not been stated. Accord, Hull v. City of Duncanville, 678 F.2d 582, 584-85 (5th Cir.1982). See also Major v. Benton, 647 F.2d 110, 112-13 (10th Cir.1981). See Baker v. McCollan, supra. The state-of-mind of the defendant, however, may be relevant as to the first element of a section 1983 claim; whether a constitutional violation occurred in the first place. Baker v. McCollan, supra, at 140 n. 1, 99 S.Ct. at 2692 n. 1.
 
 
 [4]
 See Major v. Benton, 647 F.2d 110 (10th Cir.1981). See also Bowers v. DeVito, 686 F.2d 616 (7th Cir.1982)
 
 
 [5]
 In Williams v. Kelly, 624 F.2d 695 (5th Cir.1980), and Hull v. City of Duncanville, 678 F.2d 582 (5th Cir.1981), the court applied the "abuse of government power" standard in arriving at its conclusion that there was no constitutional violation. In Williams v. Kelly, the court stated:
 Section 1983 plaintiffs must prove both (1) deprivation of a federal constitutional or legal right, ... which (2) resulted from "the sort of abuse of government power that is necessary to raise an ordinary tort by a government agent to the stature of a violation of the Constitution." ... This latter element renders federal rights protection far less extensive than that afforded by the common law of battery and negligence....
 The deceased's interest in life plainly was of constitutional dimension. U.S. Const. amend. XIV, Sec. 1. We thus must ask whether defendants' conduct--independent of its lawfulness or unlawfulness at state law--was sufficiently egregious as to be "constitutionally" tortious.... [T]he constitutionality of defendants' conduct rests on
 such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.
 624 F.2d at 697 (emphasis added) (citations omitted). See also Shillingford v. Holmes, 634 F.2d 263, 265 (5th Cir.1981).
 The plaintiff argues that this abuse of government power test does not survive Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), since Parratt allowed a section 1983 claim based on a negligent deprivation of property. This argument ignores language in Baker v. McCollan, 443 U.S. 137, 140 n. 1, 99 S.Ct. 2689, 2692 n. 1, 61 L.Ed.2d 433 (1979), where the Supreme Court pointed out that the defendant's state of mind can be relevant as to whether a constitutional violation occurred. Additionally, Hull v. City of Duncanville was a post-Parratt case in which the Fifth Circuit discussed Parratt and applied the abuse of government power standard.
 Even without the abuse of government power standard, I do not believe the plaintiff in the present case has stated a constitutional violation.
 
 
 [6]
 In Lugar v. Edmondson Oil Co., --- U.S. ----, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), the Supreme Court held that conduct which satisfies the "state action" requirement of the fourteenth amendment also satisfies the "under color of state law" requirement of section 1983. 102 S.Ct. at 2753
 
 
 [7]
 See Lugar v. Edmondson Oil Co., 102 S.Ct. at 2754-55; Blum v. Yaretsky, 102 S.Ct. at 2785-86
 
 
 [8]
 See also Greco v. Orange Memorial Hospital Corp., 513 F.2d 873 (5th Cir.1975); Trageser v. Libbie Rehabilitation Center, Inc., 590 F.2d 87 (4th Cir.1978); Musso v. Suriano, 586 F.2d 59 (7th Cir.1978), cert. denied, 440 U.S. 971, 99 S.Ct. 1534, 59 L.Ed.2d 788 (1979)
 
 
 [9]
 The reasoning in Polk County v. Dodson dealing with the "under color of law" requirement of section 1983 is equally applicable to cases where "state action" is the issue. Blum v. Yaretsky, 102 S.Ct. at 2788 n. 20